FILED
2025 Sep-10 PM 07:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE BLUE CROSS BLUE SHIELD: ANTITRUST LITIGATION | **No. 25-md-10000-RDP** |
| Alaska Air Group, Inc., *et al.*,<br>Plaintiffs,<br>v.<br>Anthem, Inc., *et al.*,<br>Defendants. | **No. 2:21-cv-01209-RDP** |
| JetBlue Airways Corporation, *et al.*,<br>Plaintiffs,<br>v.<br>Anthem, Inc., *et al.*,<br>Defendants. | **No. 2:22-cv-00558-RDP** |
| Bed Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, *et al.*,<br>Plaintiffs,<br>v.<br>Anthem, Inc., *et al.*,<br>Defendants. | **No. 2:22-cv-01256-RDP** |

**THE PARTIES' JOINT SUBMISSION REGARDING COORDINATION BETWEEN THE ASO ACTIONS AND PROVIDER OPT-OUT ACTIONS**

The parties to the above-captioned ASO Actions and the transferred Provider Opt-Out Actions (identified in Appendix A) (together, the "Parties") respectfully submit this Joint Report pursuant to the Court's August 8, 2025 Order regarding coordination between these cases. This report follows the Parties' August 28, 2025 meet and confer, and additional discussions and correspondence, and sets forth preliminary case management matters (Section I),

and the Parties' respective positions on coordination (Section II, the Blues; Section III, the National Account Opt-Out Subscribers; and Section IV, the Provider Opt-Out Plaintiffs).

## I. APPOINTMENT OF LEADERSHIP COUNSEL AND A SPECIAL MASTER

### A. APPOINTMENT OF LEADERSHIP COUNSEL

To facilitate communication and promote coordination between these cases, the Blues and ASO Plaintiffs have agreed to the appointment of Leadership Counsel. Leadership Counsel will serve as the spokesperson and primary point of contact for each side's respective group while these cases are pending in the Northern District of Alabama. The appointment of Leadership Counsel is not intended to, and shall not, replace necessary communications with counsel for individual parties on individual issues (*e.g.*, discovery issues unique to a specific party). The Blues propose Karin DeMasi as Leadership Counsel for the Blues. ASO Plaintiffs propose Phil Cramer as Leadership Counsel for the National Account Opt-Out Subscribers.

The Provider Opt-Out Plaintiffs respectfully submit that the appointment of Leadership Counsel is not customary in individual opt-out cases and is not necessary in this case. The term "leadership" as it is typically understood in MDL proceedings, is most often employed in representative actions, such as class actions and mass torts. The court selects a lead counsel or committee of lead attorneys to "represent" absent parties pursuant to Federal Rule of Civil Procedure 23. But this is ***not*** a representative action. No party is absent and they are all represented by counsel of their choice with their own separate attorney-client relationships. Each of the various health systems, hospitals, and other healthcare providers that make up the Provider Opt-Outs chose to seek individualized relief and to prosecute its claims in a separate case; each Provider Opt-Out must be able to control the strategy and litigation of its own claims.

Accordingly, there are limits to the structure an MDL transferee court can impose from a leadership perspective.

Notwithstanding the inherent differences between representative and direct actions, Provider Opt-Outs share the Court and Special Master's interest in ensuring these actions proceed efficiently. Provider Opt-Outs are therefore open to appointing liaison counsel for specific *administrative* purposes set forth in an agreed-upon court order, such as scheduling or relaying messages to or from the Court or Special Master, and coordinating with the Blues and ASO Opt-Outs where it would be efficient. The Provider Opt-Outs are willing to work together, in good faith, to first prepare a proposed order that spells out the precise responsibilities of the liaison counsel and then select appropriate liaison counsel.

### B. APPOINTMENT OF A SPECIAL MASTER

The parties to the Provider Opt-Out Actions agree to, and respectfully request the appointment of, a Special Master to assist the parties with issues relating to coordination, and to attempt to resolve informally discovery disputes, scheduling and other issues that may arise. The parties to the Provider Opt-Out Actions respectfully suggest the appointment of Edgar C. Gentle, III, of Gentle, Turner & Benson LLC, who has successfully played this role in the ASO Actions, as well as in the MDL class actions. Attached as Appendix B is a proposed order for appointment of Mr. Gentle as Special Master.

## II. BLUES' POSITION ON FURTHER COORDINATION

### A. PRELIMINARY CASE MANAGEMENT MATTERS

#### i. Status of the Federal Provider Opt-Out Cases

At present, 20 Provider Opt-Out Actions, identified in the attached Appendix A, have been transferred to this MDL for coordinated pretrial proceedings. For any additional

Provider-track opt-out case filed in federal court,[1] Defendants will promptly tag such action to the MDL and Provider Opt-Out Plaintiffs have agreed not to oppose transfer. With very few exceptions, service has been waived, effectuated or is underway for all pending cases.

ii. **Protective Orders**

To facilitate coordination, the Blues are prepared to make substantial amounts of discovery available as soon as all necessary protective orders are in place. As parties to the MDL, the Provider Opt-Out Plaintiffs are already bound by the MDL Protective Order (*see* MDL Dkt. 550 at 1-2). In addition, given that the parties anticipate the exchange of meaningful structured data that includes HIPAA-protected information, Defendants have sent to Provider Opt-Out Plaintiffs a draft proposed vendor security requirements order (the "VSR"). The VSR tracks the comparable order entered by this Court in the ASO Actions, and is attached hereto as Appendix C. Defendants respectfully request the prompt entry of this order.

**B. <u>BLUES' PROPOSAL ON COORDINATION</u>**

Throughout these proceedings, the Court has encouraged the parties to "major on the majors" and to focus on getting the "big rocks in first". (*See, e.g.*, Apr. 21, 2017 Hr'g Tr. at 20:14-15, MDL Dkt. 1109; Mar. 13, 2024 Hr'g Tr. at 11:11-13, *Alaska Air* Dkt. 428.) That is precisely what the Blues' proposal for coordination, set forth in more detail below, does. The biggest "rock" in these antitrust cases is the standard of review to which the alleged restraints will be subject. That issue determines the burdens of proof that apply, the range of defenses that can be deployed and the breadth of fact and expert discovery that the parties will exchange. And the issue is common across the ASO and Provider Opt-Out Actions, all of which challenge the

[1] Provider Opt-Out Plaintiffs have informed Defendants that at least one additional federal opt-out complaint will be filed in the coming weeks.

same core Blue Rules. In the ASO Actions, standard of review is being teed up for the Court this fall: briefing will be fully submitted by November 2025. (*See Alaska Air* Dkt. 585 at 2.) The Blues' proposal, thus, prioritizes this key issue across the cases by moving quickly and efficiently through the pleading stage in the Provider Opt-Out Actions (*see infra* Section II.B.i); producing promptly to the Provider Opt-Out Plaintiffs the ample standard of review discovery already in the MDL record (*see infra* Section II.B.ii); and prioritizing standard of review briefing on a timeline that allows the Court to achieve maximum efficiency between the Provider Opt-Out Actions and the ASO Actions (*see infra* Section II.B.iii). Finally, the Blues propose a mechanism to address additional areas of overlap and coordination between the Provider Opt-Out Actions and the ASO Actions. (*See infra* Section II.B.iv.)

#### i. Provider Opt-Out Pleadings

The Provider Opt-Out Actions comprise 20 (soon to be 21) separate complaints brought by 600+ named plaintiffs and seek damages on behalf of more than 7,000 individual providers. (*See, e.g.*, *Adventist Health Sys. Sunbelt Healthcare Corp., et al. v. Blue Cross and Blue Shield Ass'n, et al.*, No. 25-cv-2367 (N.D. Ill.), Dkts. 1 (200-page complaint), 1-01 (76-page appendix listing 2,100+ related entities on whose behalf the complaint is brought).) Responding to these complaints individually under the Federal Rules would be exceedingly burdensome; answering the complaints alone would require Defendants to collectively serve and file 660 answers.[2] Faced with such circumstances, MDL courts routinely order the plaintiffs to

[2] Provider Opt-Out Plaintiffs are wrong that this can be avoided through consolidated answers as to each complaint. All but two complaints name 30+ Blue Defendants and make Defendant-specific allegations; as such, each Defendant will have to answer separately. Moreover, even Provider Opt-Out Plaintiffs' approach would involve 20+ answers. Provider Opt-Out Plaintiffs' suggestion to follow the approach in the ASO Actions likewise fails: the ASO Actions are three complaints with approximately 60 plaintiffs—not dozens of complaints brought by several hundred plaintiffs comprising several thousand providers. Indeed, the experience of answering the ASO Action complaints (burdensome on its own) only confirms that a different procedure is needed here.

file consolidated complaints. (*See, e.g.*, *In re: MultiPlan Health Ins. Provider Litig.*, MDL 3121, No. 1:24-cv-06795 ("*MultiPlan*") (N.D. Ill.), Dkt. 161 at 2; *In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, MDL 3047, No. 4:22-md-03047 (N.D. Cal.), Dkt. 111 at 2; *In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, MDL 2738, No. 3:16-md-02738 (D.N.J.), Dkt. 74 ¶ 7; *see also* MDL Dkt. 79 at 2.) This is the approach that the Special Master suggested to the parties here, and the Blues agree that consolidated complaints make sense, particularly given that the Provider Opt-Out complaints are largely copycats of each other (and of the MDL class action complaints). Below is the Blues' specific proposal for consolidated complaints and responses in the Provider Opt-Out Actions; it ensures that the parties and the Court are not bogged down for months (or longer) in the initial pleading stage, but rather can move to substantive phases of the case where the Court and parties can maximize efficiencies on issues common with the ASO Actions. Defendants shared this proposal as part of the Court-ordered August 28 meet and confer, but Provider Opt-Out Plaintiffs rejected it, as they set forth below.

a. Consolidated Master Complaints. By **September 30, 2025,** Provider Opt-Out Plaintiffs should serve two consolidated complaints containing all common allegations: (1) by plaintiffs that assert claims on behalf of providers that include facilities (the "Facility Complaint"); and (2) by plaintiffs that assert claims exclusively as or on behalf of physicians, physician groups or physician organizations (the "Professional Complaint") (together, the "Consolidated Complaints").[3] Segregating the Provider Opt-Out Plaintiffs in this way will enable future efficiencies—for example, allowing early identification (before

[3] Each Provider Opt-Out Plaintiff would participate in only one Consolidated Complaint; any plaintiff asserting both facility and professional claims would participate in the Facility Complaint.

significant, expensive and burdensome discovery) of those professionals that have already released their antitrust claims against the Blues through the prior class action *Love* settlements.[4] (*See* MDL Dkt. 2902 at 11 ("Providers' claims in this MDL fall squarely within the scope of the *Love* releases"); *see also* MDL Dkt. 2754.)

b. Plaintiff-Specific Short-Form Complaint. In addition to the Consolidated Complaints, by **October 30, 2025**, each individual Provider Opt-Out Plaintiff will serve a short-form complaint ("SFC") setting forth Plaintiff-specific allegations. The SFCs will allege the "plaintiff-specific" "factual questions" that Plaintiffs claim to assert (JPML Dkt. 951 at 1; *see also* JPML Dkt. 911-1 at 5), positioning the Blues to effectively test those assertions in discovery. Defendants' proposed form SFC is attached hereto as Appendix D.[5] To ensure that the MDL Court's rulings on the pleadings, if any, are operative and effective in the transferee courts post-remand, the legally operative pleading for each individual plaintiff will be the combination of (i) the relevant Consolidated Complaint (Facility or Professional) and (ii) that Plaintiff's SFC; at the same time, each case should retain its individual nature, including for purposes of *Lexecon* rights, *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998). This is the approach the MDL court recently adopted in the *MultiPlan* litigation, where counsel for many of the parties are also counsel here. (*See MultiPlan* Dkt. 179 at 2 (ordering that the consolidated pleadings "will supersede and replace all claims in any . . . action pending in this MDL" and that the consolidated complaint "combined with the Short Form

---

[4] As an example of how this would facilitate efficiency, having a Professional Complaint would allow the *Love* issue to be analyzed simultaneously with the same analysis underway as part of the Provider settlement administration. Involving the Special Master in this parallel analysis would create substantial efficiency.

[5] Defendants shared the proposed SFC and invited Provider Opt-Out Plaintiffs to comment, but received no edits.

Complaint filed by that Plaintiff . . . shall be deemed that Plaintiff's legally operative pleading").)

c. Responsive Pleadings. Assuming the above procedures are implemented, each Defendant agrees to respond to each of the two Consolidated Complaints by **December 1, 2025** with one of the following: (i) a motion to compel arbitration pursuant to any applicable arbitration agreement; (ii) a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2);[6] or (iii) for any Defendant not responding pursuant to (i) or (ii) above, a single consolidated answer for each of the Consolidated Complaints that contains a general denial of the allegations in the Consolidated Complaint.[7] To accompany the consolidated answer—and to address, on the front-end, some of the inefficiencies that the parties had to work through in the early days of the ASO Actions—Defendants agree to create a master list of all affirmative defenses and counterclaims that any Blue intends to assert (the "Defenses and Counterclaims List"). Each Defendant would agree to use the Defenses and Counterclaims List to identify each affirmative defense and/or counterclaim asserted by that Defendant, using the numbering from the common Defenses and Counterclaims List. In agreeing to limit themselves to such responsive pleadings at this stage, Defendants would expressly preserve for appeal, as if made and decided in the MDL, any Rule 12(b) motion to dismiss argument previously made and decided in MDL No. 2406. Defendants would also expressly preserve their right to make any appropriate motions under Rule 12(b)(1) and under Rule 12(c) of the Federal Rules of Civil Procedure on the timeframe permitted under the rules. Defendants would prepare

[6] Defendants understand that the Court has already ruled on issues related to personal jurisdiction in the MDL (*see* MDL Dkts. 204, 369, 469, 925); however, unlike with the other motions, certain Defendants believe they need to move under Rule 12(b)(2) in these Actions in order to preserve this issue for appeal.

[7] For efficiency, answers would not be required as to any individual SFC, unless ordered by the Court. (*See, e.g.*, *MultiPlan* Dkt. 179 at 6.)

and present a stipulation to this effect to the Court, should the Court agree with these procedures. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020) ("[A]n MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL."); *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 176 (C.D. Cal. 1976) ("[T]he consolidation of pleadings for pretrial purposes is within the discretionary power of the district court, particularly in the context of complex pretrial proceedings pursuant to 28 U.S.C. s 1407(a).").

**ii. Initial Discovery Matters**

Consistent with their goal of moving the Provider Opt-Out Actions expediently past the pleading stage, the Blues are proactively working to get Provider Opt-Out Plaintiffs access to relevant discovery. This is so, even though the Blues have not yet answered a single complaint (and in some cases, have not yet been served), and Provider Opt-Out Plaintiffs have not yet served a single discovery request. The status of those efforts, and proposed next steps, are set forth below.

a. MDL Unstructured Documents. Defendants proposed that they make reproductions of their underlying MDL documents to Provider Opt-Out Plaintiffs, the same as they did to ASO Plaintiffs. During the meet and confer process, counsel for ASO Plaintiffs proposed an even more efficient approach: rather than require Defendants to reproduce their MDL documents yet again, ASO Plaintiffs could simply grant access to their database containing such documents to Provider Opt-Out Plaintiffs.[8] This approach makes sense for everyone for a host of reasons, including that (i) there is overlap of counsel between the Provider Opt-Out

[8] Despite Mr. Cramer questioning whether his participation was needed during several of the Parties' coordination meetings, the Blues found Mr. Cramer's involvement to be both necessary and affirmatively helpful.

Actions and the ASO Actions (indeed, Jon Corey, who has served as a spokesperson for the Provider Opt-Out Actions, is also counsel in the ASO Actions), and such counsel does not need duplicative access to the same documents; and (ii) the ASO Plaintiffs' database already contains additional relevant materials beyond those originally produced in the MDL (*e.g.*, more recent copies of Blue Rules that both sets of plaintiffs challenge). This approach affords Provider Opt-Out Plaintiffs quick access to more than 10 million documents—*without ever serving a single discovery request*. In addition, for any Defendant that did not produce the entirety of its MDL document production to ASO Plaintiffs, such Defendant would make an additional reproduction to Provider Opt-Out Plaintiffs. Attached as Appendix E is the reproduction proposal that Defendants made to Provider Opt-Out Plaintiffs, which productions would be substantially complete by **November 7, 2025**. Furthermore, Defendants have already offered to meet and confer with Provider Opt-Out Plaintiffs regarding their questions about their respective MDL document productions as part of the Rule 26(f) and Rule 16 process (*see infra*). As the Blues have explained to Provider Opt-Out Plaintiffs, many of their questions will be answered by obtaining access to the documents themselves, and most of the additional, highly detailed information Provider Opt-Out Plaintiffs seek does not exist in a form that could be readily provided by the Blues.

b. <u>MDL Structured Data</u>. Again, based on the Blues' proactive outreach, the parties to the Provider Opt-Out Actions are negotiating what structured data from the MDL will be reproduced in the Provider Opt-Out Actions. As set forth above, Defendants proposed a VSR to Provider Opt-Out Plaintiffs more than two weeks ago, and request that it be entered so that structured data can be reproduced.

c. Additional Discovery/Rule 26 Conference. Given the significant amount of discovery that will be made available to Provider Opt-Out Plaintiffs through the means set forth above, additional discovery of Defendants in the Provider Opt-Out Actions, if any, can and should be tailored to be non-duplicative of discovery already provided to Provider Opt-Out Plaintiffs. (*See* JPML Dkt. 951 at 2 ("Transfer thus will eliminate the potential for duplicative discovery.").) As Provider Opt-Out Plaintiffs make clear (*see infra* Section IV.A.), Defendants will of course need full discovery of Plaintiffs, which should begin after the Rule 26(f) conference.

Defendants have also considered how the new Proposed Rule 16.1 of the Federal Rules of Civil Procedure can assist the parties and the Court in effectively managing discovery in these Actions. Among other things, pursuant to Proposed Rule 16.1(c)(4), Defendants will request fact sheets from each Provider Opt-Out Plaintiff in connection with early discovery to better understand the factual bases for each Provider Opt-Out Plaintiff's claims and to help the Court and the parties streamline case management. Defendants are prepared to discuss this issue further at the upcoming September 24 status conference, so that the parties may proceed with satisfying their obligations under Rule 26(f) and Rule 16.

**iii. Standard of Review**

Among the reasons the JPML cited for its decision to transfer these cases was to "address legal questions common to the opt-out plaintiffs" and to "eliminate the potential for . . . inconsistent rulings". (JPML Dkt. 951 at 2.) As discussed above, the threshold legal issue in these coordinated cases is what antitrust standard of review applies to the challenged conduct. Defendants thus maintain that setting the standard of review should be prioritized in the Provider Opt-Out Actions, as it was in the underlying MDL (*see* MDL Dkt. 1226), and the ASO Actions

(*see Alaska Air* Dkt. 585). Deciding this issue early and consistently across cases will help the parties to the Provider Opt-Out Actions to focus on fact discovery and to fully evaluate the relevant expert issues. (*See, e.g.*, MDL Dkt. 1226 (Discovery Order 51); *see also* Apr. 21, 2017 Hr'g Tr. at 20:14-15, 18:4-5, MDL Dkt. 1109.) Briefing the standard of review promptly will also create efficiencies for the Court, as it is already accepting standard of review briefing in the ASO Actions this fall. Because these actions challenge many of the same alleged restraints, efficiency is served by having the issues briefed before the Court as contemporaneously as possible to enable it to decide this critical issue once across all cases.

Moreover, because of Defendants' agreement to forego certain Rule 12 motions (*see supra* Section II.B.i.c) and accelerate Provider Opt-Out Plaintiffs' access to discovery (*see supra* Section II.B.ii), the parties to the Provider Opt-Out Actions are well positioned to brief this issue promptly. Indeed, many of the Provider Opt-Out Plaintiffs cite extensively to the Court's prior standard of review decisions in their complaints, confirming Plaintiffs are already well-versed in these issues. (*See, e.g.*, *Temple Univ. Health Sys., Inc., et al. v. Blue Cross Blue Shield Ass'n, et al.*, No. 2:25-cv-01156 (E.D. Pa.), Dkt. 1 ¶¶ 224, 239, 285-87; *Adventist Health Sys. Sunbelt Healthcare Corp.*, Dkt. 1 ¶ 30.) Provider Opt-Out Plaintiffs' position that standard of review briefing must await full discovery—as it supposedly did in the MDL and ASO Actions (*see infra* Section IV.C)—ignores that both cases required *new* discovery. The MDL required discovery because it was the first case where the issue was considered for the first time; and the ASO Actions required discovery because self-funded purchasers were never part of the MDL (having been added at the very end of the Subscriber MDL for settlement purposes and then filing their own, new direct actions). Provider Opt-Out Plaintiffs, in contrast, were absent class members throughout the Provider-track MDL and are now again parties to the MDL. As such,

they will be granted access to the full MDL standard of review discovery record that already exists. Full provider discovery on those issues has been taken and will be made available.

Indeed, Provider Opt-Out Plaintiffs' position—stated in the meet and confer and again below—is that, as parties to the MDL, they believe the Court's prior decisions setting the standard of review in this MDL (*see* MDL Dkts. 2063, 2933, 2934) already apply to them, making additional briefing on standard of review unnecessary. Defendants agree that Provider Opt-Out Plaintiffs' Price-Fixing Claims and Group Boycott Claims for the entire period (2008 to present), and their Horizontal Market Allocation Claims for the period commencing April 2021 (to present) are governed by the rule of reason, for all the reasons this Court has previously held. (*See* MDL Dkts. 2063 at 49-54; 2933; 2934.) Should the Court agree to follow its prior rulings as to these claims and time periods, the Blues agree that no further briefing on these issues is needed.

With respect to Provider Opt-Out Plaintiffs' Horizontal Market Allocation Claims for the period prior to April 2021 (*i.e.*, from 2008 to April 2021, when the National Best Efforts rule was in effect), Defendants maintain that the rule of reason also governs. This is for, among other things, the very same reasons previously identified by and discussed with this Court in connection with the ASO Actions and the underlying Provider-track MDL. (*See, e.g.*, Feb. 7, 2025 Hr'g Tr. at 23:2-5, MDL Dkt. 3272; Apr. 4, 2025 Hr'g Tr. at 115:2-3, *Alaska Air* Dkt. 578; *see also Alaska Air* Dkts. 488, 512.) The Blues therefore respectfully propose that the Provider Opt-Out Actions proceed efficiently to standard of review, so that the Court has the opportunity to consider and decide the pre-April 2021 standard of review for the alleged "Market Allocation Conspiracy"—an issue that is common to all these cases—once across both the ASO Actions and

the Provider Opt-Out Actions.[9] As Defendants have already stated, they are not requesting any change to the standard of review briefing schedule in the ASO Actions, which will be completed this fall and ripe for decision; rather, Defendants submit that standard of review should be the first stage in the Provider Opt-Out Actions. This will allow the Court to have the benefit of briefing in all coordinated actions, and will afford the MDL parties the clarity of the Court's decision on this critical issue early in discovery. Defendants do not believe that any special provisions for, or changes in, the parties' historic filing and sealing practices (*see infra* Section III) are necessary or warranted to achieve these efficiencies. This Court has developed the current procedures the Parties follow after more than a decade of experience with these cases; and there is no reason to change or depart from them now.

To accomplish this coordination, Defendants propose the following briefing schedule to set standard of review on the Provider Opt-Out Plaintiffs' Horizontal Market Allocation Conspiracy claims for the period prior to April 2021: (1) opening briefs due on **January 23, 2026**; (2) opposition briefs due on **March 20, 2026**; and (3) reply briefs due by **April 17, 2026**.

### iv. Further Matters

As part of the Rule 26(f) process described above (*see supra* Section II.B.ii.c), Defendants agree to work to identify additional areas of overlap and efficiency, so that issues that are common across the Provider Opt-Out Actions and the ASO Actions, such as certain

---

[9] Standard of review is also set to be briefed in the first of the California state court opt-out cases (*i.e.*, the *Prime* Action) by May 2026. (*See* Case Mgmt. Order Re Schedule for Determining the Standard of Review, *VHS Liquidating Tr. v. Blue Cross of Cal.*, No. RG21-106600 ("*Prime*") (Cal. Super. Ct. – Alameda Cnty. May 21, 2025).) Defendants maintain that this Court and the California state court (the Honorable Somnath Raj Chatterjee) should informally coordinate on standard of review to ensure consistency, in particular, for purposes of setting standard of review. Such coordination is warranted here given not only the near identity of issues, but also the overlap of counsel: the Bartko firm is counsel in both the ASO Actions and *Prime*, and the Paul Hastings firm is counsel in certain Provider Opt-Out Actions and in an additional California state court opt-out action (*Regents*).

summary judgment motions, need only be addressed and decided by the Court once. As shown in the Venn Diagram Defendants previously submitted to the Court (reattached as Appendix F for the Court's convenience), there is ample opportunity for additional coordination between the Provider Opt-Out Actions and the ASO Actions. Defendants anticipate front-loading and expediting these common issues for decision in the Provider Opt-Out Actions—as with standard of review in order to benefit the Court and without delaying resolution of these issues in the ASO Actions.

Although the opportunities for, and benefits of, coordination are obvious, Defendants are not surprised that ASO Plaintiffs and Provider Opt-Out Plaintiffs are resisting them (*see infra* Sections III, IV.A): that is because these Plaintiffs participate on opposing sides of a two-sided platform and hold positions that are inherently at odds with each other. However, this is precisely why coordination is so important—to ensure that the rulings across these cases are not only consistent, but also reflect the market dynamics happening on both sides of the market and that inevitably affect both sets of cases.

## III. NATIONAL ACCOUNT OPT-OUT SUBSCRIBERS' POSITION ON COORDINATION

The National Account Opt-Out Subscribers understood the Court's order to direct the various parties to discuss potential avenues for coordination among the National Account Subscriber Opt-Out Actions and the Provider Opt-Out Actions. Counsel for the National Account Subscriber Opt-Outs participated in all of the meet and confers regarding coordination and offered insights from their past five years of dealings with Defendants in an effort to assist both the Blues and the Provider Opt-Outs mitigate the burdens associated with discovery. As reflected above, Defendants spent the majority of time addressing intra-Provider Opt-Out coordination as opposed to inter-ASO and Provider Opt-Out coordination. Indeed, the meet and

confers resembled a Rule 26(f) conference in the Provider Opt-Out cases more than an inter-action coordination call among representatives for all three groups. Counsel for the National Account Opt-Out Subscribers tried to focus the conversation regarding actual areas of coordination among the cases.

Toward that end, Counsel for the National Account Subscriber Opt-Outs offered avenues for counsel in the Provider Opt-Out Actions to benefit from the immense work undertaken by counsel in the National Account Subscriber Opt-Out actions to create a discovery record and organize it in a 30.9 (and counting) terabyte document database. This proposal would obviate Defendants' need to reproduce more than 1,000 (and growing literally every day despite the close of document discovery 9 months ago) document productions amounting to more than 20 million documents produced to the National Account Opt-Out Subscribers. Such access would relieve Provider Opt-Outs from having to construct a document database of their own. Subscriber Opt-Outs have documented the out-of-pocket costs (not including the millions of dollars in attorney, paralegal, and other professional time expended) they have incurred related to this database and worked with Provider Opt-Outs to explore a mutually-amenable solution. Subscriber Opt-Outs also offered to transfer complete deposition packages of the more than a hundred depositions taken by Subscriber Opt-Outs in their proceedings. Subscriber Opt-Outs and Provider Opt-Outs are working to refine details of an agreement for this turnkey solution.

Subscriber Opt-Outs believe that the aforementioned solution likely represents the extent to which discovery may be coordinated among the various actions given the September 26, 2025 end of fact discovery in the Subscriber Opt-Out actions. Subscriber Opt-Outs do not foresee any other meaningful or productive avenues for coordination given the different procedural postures of the cases and the Court's prior rulings in the MDL. Toward this end, the

Subscriber Opt-Outs engaged in productive dialogue with Defendants to ensure that the pre-trial schedules remain fully intact in the Subscriber Opt-Out cases, and, all parties have confirmed that nothing in the Provider Opt-Out cases shall cause any delay in the Subscriber Opt-Out actions, including with respect to the standard of review briefing, argument on that briefing, any decision to be rendered by the Court, the service of expert reports, and the filing of motions for summary judgment.

Defendants explained in a prior filing (*Alaska Air* Dkt. 359) that "the MDL litigation explored a wide range of issues with little-to-no connection to the ASO Plaintiffs' current claims" and expressed incredibility at how, in the context of expert reports, "*any reports* from the Provider track might be relevant to their case." *Id.* at 2, 4. Subscriber Opt-Outs agree with the Provider Opt-Outs that there is minimal utility for coordination on non-discovery matters as the following Venn Diagram illustrates:




Subscriber Opt-Outs agree with Defendants that issues "need only be addressed and decided by the Court once." *Infra* at 14. However, Subscriber Opt-Out's experience thus far has been that

Defendants repeatedly seek reconsideration of the Court's decisions, including those related to the standard of review, discovery parameters, claims of two-sided market considerations, jurisdiction and venue, affirmative defenses, and motions to dismiss. Subscriber Opt-Outs welcome Defendants' indication that they will now accept this Court's prior (and future) decisions, which should streamline the forthcoming briefing on the standard of review in the Subscriber Opt-Out cases. Accordingly, the only remaining coordination on non-discovery matters that could arise as summary judgment approaches in the Subscriber Opt-Out cases (December 17, 2026) may involve certain overlapping affirmative defenses asserted by Defendants that have not yet been previously addressed by the Court and that may be presented for adjudication.

Defendants have asked that Provider Opt-Outs receive access to the standard of review briefing in the Subscriber Opt-Out cases. It is anticipated that the primary reason that any such materials would be filed under seal would be Defendants' designation of their materials under the protective order. Accordingly, Subscriber Opt-Outs suggest that within five days of the filing of any standard of review submission, each side shall identify any information from the opposing parties' filings that they request redaction, including any third-party material produced pursuant to a subpoena issued by that party. The party shall then file a public redacted version of such filing within five days thereafter. The sharing (presumably by the Blues) of any material that remains under seal may then be addressed. With respect to the parties' prior filings in response to the Court's show cause order (*Alaska Air* Dkt. # 493), the parties should identify by September 18, 2025, any information, including exhibits, they seek to remain under seal. If there are no redactions to a submission, then it shall be unsealed. If there are redactions, then the party requesting such redactions shall prepare a redacted version of the filing/submission and file it on

the public docket. The National Account Opt-Out Subscribers suggest that the wholesale filing of exhibits under seal should be discouraged and only those portions of exhibits that actually contain confidential information akin to trade secrets should be redacted pursuant to the process set forth above. This will both minimize sealing on the docket and facilitate how any material that remains under seal/redacted may then be addressed by the parties.

## IV. PROVIDER OPT-OUTS' POSITION ON COORDINATION

**Preliminary Statement**[10]

The Provider Opt-Out Plaintiffs ("Provider Opt-Outs") are a group of diverse health care providers from across the country, including well-known health systems, children's hospitals, religious non-profits, state-run university health systems, award-winning research hubs, and specialized cancer treatment centers. The Provider Class Settlement required each provider to make a choice to remain in the class or to opt-out based on the information available to it and considering its own circumstances. After careful consideration of its statutory and contractual obligations to its respective constituents, each Provider Opt-Out Plaintiff ultimately decided to file an exclusion request and to pursue its own claims. Each Provider Opt-Out had its own reasons for making this important choice and selected its own counsel to represent its unique interests. In total, the Provider Opt-Outs have filed twenty federal complaints in various jurisdictions, including several complaints in the Northern District of Illinois, the Northern District of California, and the Eastern District of Pennsylvania that have now been consolidated by the Judicial Panel on Multidistrict Litigation in this Court.[11]

---

[10] It should be noted that the Parties could not reach agreement on the order in which to present their respective positions. While Provider Opt-Outs believe that, as Plaintiffs, their position should come first, the Blues insisted on the opposite ordering that has been implemented in this filing.

[11] This number includes the currently stayed *Anesthesia Associates of Ann Arbor* or "*A4*" action pending before the Court after transfer from the Eastern District of Michigan. *See Anesthesia Assocs. of Ann Arbor PLLC v. Blue*

The Provider Opt-Outs intend to handle their cases efficiently, including by coordinating where possible with the other parties in the action. The Provider Opt-Outs appreciate the Court's issuance of the August 8, 2025 Order directing counsel for the Blues, Subscriber Opt-Out Plaintiffs ("ASO Opt-Outs"), and the recently consolidated Provider Opt-Outs "to meet and confer *to consider what, if any*, coordination would be appropriate between the ASO opt-out cases and the Provider opt-out cases."[12]

On August 12, 2025, Special Master Gentle hosted a conference for the Blues, ASO Opt-Outs, and Provider Opt-Outs to facilitate the Court's instruction. Special Master Gentle instructed the Parties that the joint report regarding potential coordination should focus on three topics: (1) potential liaison counsel, (2) coordination on the sharing of the existing discovery record developed in the MDL and ASO Opt-Out actions, and (3) whether consolidated pleadings should be prepared. Provider Opt-Outs have met and conferred with the Blues and ASO Opt-Outs several times and address each topic, in turn, as requested by the Special Master. Of course, since the Court ordered discussions were kicked off by Special Master Gentle, his appointment was also an inherent topic, as addressed above.

In addition to these topics specifically identified by Special Master Gentle, and inherent to the Court's directive, the Blues have insisted on premature advocacy for other complex procedural and scheduling issues regarding standard of review in the narrowly focused report requested by

---

*Cross Blue Shield of Mich.*, No. 2-23-cv-00461-RDP (N.D. Ala.), April 11, 2023 Notice of Multidistrict Litigation Transfer, Dkt. No. 71. It also includes four additional actions pending transfer by the Judicial Panel of Multidistrict Litigation pursuant to Conditional Transfer Orders issued on September 3 and 8, 2025. *See* CTO-47, JPML Dkt. No. 1010; CTO-48, JPML Dkt. No. 1012. There is at least one additional complaint that will be filed by a firm that previously filed a Provider Opt-Out complaint, which would bring the total number of complaints to 21.

[12] *Alaska Air Grp, Inc., et. al. v. Anthem, Inc., et al.*, No. 2:21-cv-01209-RDP (N.D. Ala.), Dkt. No. 613 at 2 (emphasis added); *JetBlue Airways Corp., et al., v. Anthem, Inc. et al.*, No. 2:22-cv-00558-RDP (N.D. Ala.) (emphasis added), Dkt. No. 537 at 2; *Bed Bath & Beyond, Inc., et al., v. Anthem, Inc.*, No. 2:22-cv-01256-RDP (N.D. Ala.), Dkt. No. 504 at 2 (emphasis added).

the Court and the Special Master. The Provider Opt-Outs welcome a discussion of any and all topics that would facilitate an expeditious resolution of this complex litigation and, following the upcoming status conference, anticipate the Parties doing so with the benefit of the Court's guidance. However, the additional standard of review advocacy presented by the Blues contains significant legal issues and, as such, require more discussion and consideration than a joint report can adequately address.

Nonetheless, because the Blues insisted on including such extraneous and premature advocacy, the Provider Opt-Outs have no choice but to include a very preliminary response to this additional topic at the end of this joint report. As explained in more detail below, the Provider Opt-Outs' positions on the issues raised by the Court and the Special Master, and on the Blues' extraneous requests, are as follows:

1. Leadership and liaison counsel need not be formally appointed given that the Provider Opt-Out cases are not representative or class actions, but Provider Opt-Outs have provided the Court with their view on the appropriate role of liaison counsel for administrative purposes if the Court chooses to adopt such a structure (*See* Section I (A));

2. Special Master Gentle should be appointed in the Provider Opt-Out cases (*See* Section I (B)).

3. The Parties agree that discovery should commence promptly. Provider Opt-Outs submit that a Rule 26(f) conference should be done by October 1, 2025, the Parties should submit a Rule 26(f) report fourteen days thereafter, and the Court should schedule a Rule 16 conference to occur as soon as the Court is available after receiving the Rule 26(f) report (*See* Section IV (A));

4. The Parties have already agreed that many of the prior document productions made to the ASO Opt-Outs and in the MDL generally are relevant to the Provider Opt-Out cases, and Provider Opt-Outs should gain access to those productions promptly. Provider Opt-Outs are conferring with the Blues and ASO Opt-Outs regarding the facilitation of such productions (*See* Section IV (A));

5. The Court should order the Blues to provide to Provider Opt-Outs within 30 days of the filing of this Joint Report, information regarding any prior MDL discovery

that the ASO Opt-Outs never received but that was previously produced in the MDL Provider Class case and the related information (*See* Section IV (B));

6. Consolidated and short form complaints are unnecessary and inefficient in this opt-out case, and the Blues should serve a consolidated responses to the Provider Opt-Out complaints within 30 days of the Rule 16 conference (*See* Section IV (B)(2)); and

7. Briefing on the standard of review in the Provider Opt-Out cases prior to the conduct of any additional discovery that is necessary for the Provider Opt-Out cases is premature (*See* Section IV (C)).

### A. Coordination on Existing Discovery Record

The Court instructed the Parties to consider "what, if any, coordination" would be appropriate between Provider Opt-Outs and Subscriber Opt-Outs.[13] Since there are unlikely to be significant "new" legal issues in need of resolution at the motion to dismiss stage given the similarity in Provider Opt-Outs' claims against the Blues to those pleading issues already litigated by the Provider Class and ASO Opt-Outs, the propriety of such coordination should be focused on sharing existing records to maximize the efficiency of discovery. Indeed, the Blues argued repeatedly before the Judicial Panel on Multidistrict Litigation that the Provider Opt-Outs' complaints are "near carbon copies" of one another and the Fourth Amended Consolidated Complaint filed in the MDL, which the Court has already determined properly stated a claim.[14] Accordingly, Provider Opt-Outs believe the best way to facilitate a resolution of these cases is to move into discovery in earnest, rather than slowing things down to allow the Blues to file what are essentially motions for reconsideration of issues this Court has already decided.[15] Moving directly to discovery is common practice in antitrust opt-out actions and, while the Blues should obviously

---

[13] *Alaska Air Grp, Inc.*, Dkt. No. 613 at 2; *JetBlue Airways Corp., et al.,* Dkt. No. 537 at 2; *Bed Bath & Beyond, Inc., et al.*, Dkt. No. 504 at 2.

[14] *See* Defs.' Resp. to Pl.'s Mot. to Vacate CTOs, JPML Dkt. No. 817 (May 14, 2025).

[15] To the extent the Blues believe they need to preserve their appellate rights, the Provider Opt-Outs are willing to enter into an appropriate stipulation doing so.

feel free to identify any "new" issues that need to be addressed by motion, the Court should not allow any such motions to impede efficient and orderly progress of the Provider Opt-Out cases.

Provider Opt-Outs have identified certain ways in which the Parties should leverage prior discovery, where possible, allowing these cases to move expeditiously and enabling Provider Opt-Outs to litigate their individual claims against the Blues efficiently. To that end, the Provider Opt-Outs have proposed that all of the Blues' productions in the ASO Opt-Out actions (which includes partial productions from the MDL and responses to separate discovery requests issued by the ASO Opt-Outs) be considered re-produced in the Provider Opt-Out actions. The Blues have agreed to that proposal and also proposed the production of more information (for example, complete MDL productions in some cases) via letter on September 4, 2025.

The Parties remain in discussions about the possibility for the Provider Opt-Outs to gain access to some of these prior productions via a database used by the ASO Opt-Outs. If those discussions do not bear fruit, then the Blues should be prepared to promptly reproduce copies of the relevant prior productions to the Provider Opt-Outs.[16]

Provider Opt-Outs believe their proposal to access the prior discovery is reasonable and, where possible, it should be used to avoid duplicative efforts, promote efficiencies and expeditiously advance this litigation. Even with such "access," however, further discovery must be conducted in the Provider Opt-Out cases to address significant issues not covered by the MDL Class cases or the ASO Opt-Out cases, because, for example:

a. MDL document production ended in 2016;

[16] Provider Opt-Outs, ASO Opt-Outs, and the Blue Defendants still need to reach an agreement regarding any costs related to such access. By engaging in this negotiation, Provider Opt-Outs are not waiving their rights to obtain this discovery directly from the Blue Defendants or to otherwise engage in their own discovery. Nor are Provider Opt-Outs conceding that any discovery conducted in distinct ASO Opt-Out cases fall under the Common Benefit Doctrine or other legal doctrine giving the ASO Opt-Outs any rights to recovery in the Provider Opt-Out cases. It does not. Rather, Provider Opt-Outs are engaging in this process to facilitate coordination in the action as contemplated by the Court and requested by the Blue Defendants.

b. MDL depositions ended in 2017;

c. The claims at issue in the ASO Opt-Out case focus on different harm caused by the alleged anticompetitive behavior; and

d. The Court's streamlining order focused the Provider track on the Alabama market, which is not the case with the Provider Opt-Out cases. *See* Dkt. No. 469 (Oct. 30, 2015), at 4-6.

Moreover, since the discovery record closed in the Provider Track:

a. Hundreds of agreements and amendments to agreements between the Provider Opt-Outs and the Blues have been negotiated and entered into;

b. The uncompetitive reimbursement rates the Blues have forced upon many Provider Opt-Outs have actually worsened;

c. The uncompetitive reimbursement rates the Blues have forced upon many of the Provider Opt-Outs have dropped relative to other large health insurers;

d. The payment experience with the Blues, both for the local Blue claims and BlueCard claims, has deteriorated;

e. The Blues have supposedly abandoned the National Best Efforts rule;

f. The personnel with whom the Provider Opt-Outs interact at each Blue have changed;

g. Some of the Provider Opt-Outs bringing claims did not exist in 2016;

h. Almost no overlap exists between providers in the State of Alabama where the Court focused the Provider Track and the Provider Opt-Outs; and

i. Ten-plus years of damages have accrued.

More recent discovery in the ASO Opt-Out actions also does not address many key aspects of Provider Opt-Outs' claims, such as contract negotiations, reimbursement rates, payment

experience, and other interactions between the Blues and Provider Opt-Outs, which are not the focus of the ASO Opt-Out cases.

To avoid duplication and actually obtain the benefit of the existing discovery record, as Provider Opt-Outs believe the Court intends, it is essential that the Provider Opt-Outs also receive information from the Blues about the prior productions, deposition testimony, and written discovery, that would allow them to understand the exact contours and limitations of the Blues' previous productions and other discovery materials. The Blues have stated that the prior productions comprise millions of pages of documents and terabytes of data. A "document dump" of this magnitude, without further information, would not allow Provider Opt-Outs to move forward expeditiously with non-duplicative discovery requests. Providing the requested information represents a necessary first step in determining the potential scope and extent of coordination. To date, the Blues have repeatedly refused to respond to basic requests about the parameters of the existing record in these actions frustrating any ability to evaluate relevance and identify areas of potential overlap. *See* Appendix G, Provider Opt-Outs' August 12 Request for Information from the Blues Requests; Appendix H, August 21 Letter from J. Corey to K. DeMasi and Information Requests.

Provider Opt-Outs therefore propose that the Blues be ordered to provide the following information related to their prior productions within 30 days of this Report:

- All of the Blues' written discovery requests and responses pertaining to the MDL and ASO Opt-Out discovery records;[17]
- Any agreed upon search terms, including custodians and/or data sources to which those search terms were applied, and all correspondence among the Blues and respective parties regarding such terms;

[17] To achieve efficiency, information responsive to this and the following requests should be provided in unredacted format to the full extent allowed under the current Protective Order.

- Any production log(s) that identify the nature of documents contained in productions;
- Identification of specific portions of the MDL document discovery record not produced to ASO Opt-Outs, including the size and subject matter of the productions withheld;
- Rule 30(b)(6) deposition notices, objections, and communications resolving any disputes;
- All Blue deposition transcripts and exhibits previously provided to the ASO Opt-Outs or authorize the ASO Opt-Outs to release them to Provider Opt-Outs;
- All Blue affirmative and rebuttal expert reports;
- A summary of the size, composition, and contours of all structured data produced in the MDL and ASO Opt-Out cases, including structured data from the National Warehouse Data, and identification of all fields produced, applicable data dictionaries, and all correspondence between the relevant parties related to negotiations on the scope and content of the structured data productions;[18]
- Identification of any structured data the Blues are not willing to deem reproduced or to produce , including non-claims data, actuarial, pricing and rating data requested by MDL Subscribers; non-commercial membership data requested by MDL Subscribers, structured data on subscriber side topics (premiums, billing, member demographics, rating data, product benefit data, etc.), and pharmacy claims data. The identification should include at a minimum the production volume of such data for each Blue, or the bates numbers if the exclusion is for less than a full production volume;
- All third-party subpoenas and responses and related correspondence;
- Identification of all third-party productions and dates of production;
- Identification of any pending and unresolved subpoenas;
- Identification of all custodians, including each custodian's employer and
- Summary of total documents produced by each custodian, data sources (e-mail, shared drives, phone, hard copies, etc.), and the date(s) of production.

[18] The Blues have indicated a willingness to produce a substantial amount of structured data but are demanding that Provider Opt-Outs negotiate separately with counsel for each of the 35 Blues. This approach is inefficient and time consuming. In advance of these discussions, the Provider Opt-Outs will need basic information about the prior structured data productions. Not all of the structured data may be useful or necessary, so the Provider Opt-Outs need sufficient information to evaluate whether to accept prior productions or negotiate new and different productions.

The information Provider Opt-Outs have requested is straightforward. Provider Opt-Outs are only requesting materials that Blues already possess and can readily identify. Only after the Blues provide this basic information will Provider Opt-Outs be in a position to assess the scope of discovery taken to date, further meet and confer with the Blues to address any gaps or remaining issues and, if necessary, engage with the Special Master to help facilitate a resolution.[19]

Contrary to the Blues' assertion herein that "many of [Provider Opt-Out's] questions will be answered by obtaining access to the documents themselves," access to the documents is not a substitute for the information Provider Opt-Outs request. This is especially so in light of the Blues' assertions that any future discovery must be "tailored" and "non-duplicative." Without the basic information Provider Opt-Outs request, Provider Opt-Outs hands will be tied. As merely one such example, Provider Opt-Outs will not be able to discern search terms from prior productions. Likewise, relying on metadata to identify custodians is not a foolproof method. Ultimately, Provider Opt-Outs request basic information about the scope of prior discovery, not "highly-detailed" or burdensome information, as the Blues would have the Court believe.

To further the prompt commencement of discovery, Provider Opt-Outs also submit that a Rule 26(f) conference should be done by October 1, 2025, the Parties should submit a Rule 26(f) report fourteen days thereafter, and the Court should schedule a Rule 16 conference to occur as soon as the Court is available after receiving the Rule 26(f) report.

### B. Consolidated Pleading

#### 1. Consolidated Opt-Out Complaints Are Not Necessary or Efficient

[19] Provider Opt-Outs believe prioritizing the Blues' productions, testimony, discovery responses, and other materials will be the source of efficiency. After Provider Opt-Outs understand the contours of the Blues' discovery record, then a determination can be made whether discussions with Class Plaintiff Counsel and counsel in the *Prime* cases makes sense.

The Provider Opt-Outs propose following the same procedure utilized in the ASO Opt-Out actions, both because it is the established approach and because it represents the most efficient way forward.[20] While the twenty Provider Opt-Out complaints that have been filed ostensibly outnumber the three ASO Opt-Out actions, it is common for defendants in antitrust opt-out actions to file answers to each opt-out complaint, even if the number of such complaints is large. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.) (defendants answering over ten separate antitrust opt-out complaints filed by large corporate opt-out entities or groups); *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917 (N.D. Cal.); *In re Xyrem Antitrust Litigation*, MDL No. 2966 (N.D. Cal.); *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa.); *In re LIBOR-based Financial Instruments Antitrust Litig.*, MDL No. 2262 (S.D.N.Y.); *In Re: Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.). The Blues should respond to the individual Provider Opt-Out complaints already on file either via a consolidated Rule 12(b) motion on any "common" issues they believe to be new, or by filing consolidated answers. If the Blues wish to pursue such motions practice, they could do so in a single filing on all common issues within 60 days of the Rule 16 conference. If the Blues choose to file such a motion, then the Provider Opt-Outs will serve a single consolidated response. If any individual Blue believes it has any unique and "new" issues to be raised by Rule 12(b) motion, then they should be permitted to file a supplemental motion, and the appropriate Provider Opt-Out(s) will respond accordingly. If the Blues opt to answer the complaints, Provider Opt-Outs propose that the Blues answer each complaint on a consolidated basis, making generalized denials of the allegations and raising all affirmative defenses and counterclaims pleaded by all or any subset of the Blues. Such answers should be filed within 30 days of the initial status conference.

---

This approach has been standard practice in antitrust opt-out actions for decades and there is no reason for this Court to depart from that practice. For example, in one of the largest series of antitrust opt-out actions on record, *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, defendants either filed a motion or answered more than 10 different plaintiffs' complaints. *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal). And in the *Interchange Fee* MDL, each plaintiff (or group of plaintiffs) maintained separate pleadings throughout the MDL. *See, In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 75 (E.D.N.Y. 2024) (referencing the "Home Depot Compl." Separately from the "7-Eleven Compl." And the "Target Compl."); *see also In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917 (N.D. Cal.); *In re Xyrem Antitrust Litigation*, MDL No. 2966 (N.D. Cal.); *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa.); *In re LIBOR-based Financial Instruments Antitrust Litig.*, MDL No. 2262 (S.D.N.Y.); *In Re: Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.). The Provider Opt-Outs' proposal is more consistent with not only the Federal Rules and typical practice, but also the true function of an MDL. In analyzing 28 U.S.C. § 1407's application to individual "actions" that may be transferred to a single district court, the Supreme Court emphasized that cases in an MDL "retain their separate identities" and are not to be merged into "any monolithic multidistrict 'action' created by transfer." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015). "After an MDL is formed," moreover, "parties continue to be the master of their individual cases and can take positions different from the other parties ostensibly on the same side of the MDL." *Fed. Ins. Co. v. 3M Co.*, 642 F. Supp. 3d 882, 895 (D. Minn. 2022). Provider Opt-Outs' proposal to simply follow the Federal Rules also maximizes efficiency and simplicity while also minimizing burden. While the Provider Opt-Outs' proposal outlines a simple choice and timeline for either Rule 12(b)(6) motions on any new issues the Blues

can identify or answers, the Blues have reserved the rights to make 12(b)(1) motions on unexplained issues, appeal existing 12(b)(6) decisions for unknown reasons, and even make 12(c) motions that have not been justified. The Provider Opt-Outs' proposal minimizes both the number of motions (if the Blues choose to pursue such practice) and the number of total pleadings (if the Blues choose to answer).

Contrary to the Blues' theoretical concern about burden, following the Federal Rules would require as few as 20, not 660, consolidated answers or a single consolidated motion to dismiss. Following the Federal Rules would also be more efficient than the Blues' Frankenstein alternative, which would add months to the schedule as Provider Opt-Outs would need to prepare two consolidated complaints and hundreds of exacting short-form complaints, only for Blues to serve dozens of answers while specifically reserving the right to make unexplained motions with questionable support on the pleadings. It is telling that despite having four to six months to analyze the majority of the Provider Opt-Out complaints, the Blues have been unable to articulate their plan with respect to the filing of responsive pleadings. The Blues' claim that following such typical procedure would be "exceedingly burdensome" is not credible, as they have repeatedly stated on the record that they view the Provider Opt-Out Complaints as "substantively identical to one another and to the Master Provider Complaint in the MDL" and "near carbon copies of the coordinated cases brought by healthcare providers pending in the Northern District of Alabama as part of MDL No. 2406."[21] If so, it is difficult to see how any planned Rule 12(b) motions by the

---

[21] Defs.' Resp. to Pls.' Mots. to Vacate CTOs, JPML Dkt. No. 817 at 1; *see also* JPML Dkt. No. 817 at 1 ("The [Provider Opt-Out Complaints] and the Consolidated Fourth Amended Provider Complaint (Dkt. No. 580-10) (the 'Master Provider Complaint') in the MDL share Defendants, causes of action, theories of liability and the same core fact pattern."), at 1-2 ("[Provider Opt-Out] Plaintiffs cannot seriously dispute that each of their actions is nearly identical to one another and to the Master Provider Complaint. These near copy-paste complaints raise common questions of fact and law and are precisely the sort of duplicative, complex cases that are suited to consolidation in an MDL."), at 6 ("The [Provider Opt-Out Complaints] are, in all relevant respects, substantively identical to one another and to the Master Provider Complaint in the MDL: [Provider Opt-Out] Plaintiffs bring the same causes of

Blues would be anything other than a request for the Court to reconsider its prior rulings at the pleading stage with respect to the Master Provider Class Complaint. *See* Dkt. No. 204 (denying Defendants' motion to dismiss on the grounds that Provider Class plaintiffs failed to state Sherman Act Section 1 antitrust claims); Dkt. Nos. 1206-07 (denying Defendants' motion to dismiss on the grounds that the Provider Class plaintiffs' failed to state Sherman Act Section 1 rule of reason and Section 2 claims). This is especially so because the Blues suggested to the JPML Panel that there were no new or "unique" issues that the Court would need to consider. Dkt. No. 817 at 7 ("Plaintiffs do not and cannot show that there are 'unique' issues of substantive law or fact sufficient to overcome the substantial commonality between and among the [Provider Opt-Out Complaints] Actions and the Provider Track of the MDL."). In making these representations to the JPML Panel, the Blues were able to easily put together a chart – attached as Appendix A to their JPML filing – illustrating that alleged commonality of legal and factual issues,[22] thereby demonstrating how easy it is for them to manage the allegedly "cut and paste" complaints in a way that deals with their claimed "pervasive" common issues.

**2. Requiring an Operative Consolidated Complaint Is Improper**

The Blues' proposal for the Provider Opt-Outs to file two *operative* consolidated complaints, one for professional physician group plaintiffs exclusively and another for facilities (or health system) plaintiffs (even though some facility plaintiffs have associated professional physician groups) is improper. As discussed above, that request conflicts with the Supreme

action against the same defendants, based on the same theories of liability, alleging the same multilateral conspiracy. As Appendix A to this brief demonstrates, the [Provider Opt-Out] Complaints copy entire sections of the Master Provider Complaint *verbatim*.") (italics in original), and at 6 ("[T]he overlap in facts, parties and legal issues between the [Provider Opt-Out Complaints] and the [MDL] Provider litigation is pervasive and plain.").

[22] For convenience, the most updated version of Appendix A that the Defendants filed with the JPML which confirms Defendants' analysis of the Provider Opt-Out Complaints and the Master Provider Complaint in the MDL is attached hereto—also as Appendix A. That updated version was filed with JPML Dkt. No. 923, another response in opposition to a JPML CTO.

Court's command that cases in an MDL proceeding must "retain their separate identities." *Gelboim*, 574 U.S. at 413. The Blues' proposal would require the very melding of the individual Provider Opt-Out complaints into a single unit that the Court condemned. To be sure, consolidated complaints are authorized and common in representative actions, such as class actions and mass torts, but the Provider Opt-Out Actions are ***not*** representative actions. Rather, they are separate actions brought by different plaintiffs represented by varied counsel for their own unique and often-differing reasons.

A forced melding of each separate action into operative consolidated complaints would not only raise myriad due process and legal concerns, including questions regarding the right to return to the filing districts for purpose of trial under *Lexecon* and the final judgment rule (as in *Gelboim)*, but also legitimate practical concerns based on the unique circumstances of the various Provider Opt-Outs. The Provider Opt-Outs have already included necessary and unique factual allegations in their respective operative complaints. The Blues are now asking that the Court require the Provider Opt-Outs to consolidate certain common allegations and reallege individual ones.

The MDL rules authorize coordination of actions, which the Provider Opt-Outs welcome, but not the merging of all actions into an operative consolidated complaint. Indeed, it is axiomatic that each opt-out plaintiff continues to be the master of its case and, absent consent, no statute or federal rule permits a court to order opt-out plaintiffs in an MDL to file an operative consolidated complaint over their objection. *Gelboim*, 54 U.S. at 413 n.3 ("Parties may elect to file a 'master complaint' and a corresponding 'consolidated answer'"); *Home Depot USA, Inc. v. Lafarge N. Am., Inc.* 59 F.4th 55, 61 (3d Cir. 2023) ("Cases centralized in an MDL 'retain their separate identities' unless they choose to proceed on a consolidated 'master' complaint"). The Blues cite *In re National Prescription Opiate Litigation* for the unremarkable proposition that an MDL court

has "broad discretion" to manage its cases, neglecting the fact that the Sixth Circuit—remarkably—granted a writ of mandamus where a district court had overstepped its authority and impeded the rights of the parties in the name of efficiency. 956 F.3d 838, 844 (6th Cir. 2020) ("[T]he law governs an MDL court's decisions just as it does a court's decisions in any other case."); *see also* Committee Note, Proposed Fed. R. of Civ. P. 16.1(b)(3)(A) ("The Rules of Civil Procedure, including the pleading rules, continue to apply in all MDL proceedings.").

There are some narrow circumstances where a group of antitrust opt-out plaintiffs may want to consent to the filing of an operative consolidated amended complaint, especially when a case is in its early stages, and the opt-outs are proceeding alongside one or more classes. But this is not that situation. The Blues have relied on the *Multiplan* MDL as a model for opt-out consolidation, but in that case, the antitrust direct action plaintiffs consented to the filing of a consolidated amended complaint and separate short form complaints. *See In re: Multiplan Health Ins. Provider Litig.*, MDL No. 3121, Dkt. No. 161 (Nov. 2, 2024) (Kennelly, J. entering an order at the inception of the case agreed to by the plaintiffs that filed direct actions (not opt-out complaints) that were transferred to the *MultiPlan* MDL and requiring a very simple short-form complaint). The MDL rules do not, however, authorize a court to impose an operative consolidated complaint without such consent. Unlike *MultiPlan*, this MDL is very mature, and the Provider Opt-Out cases do not easily lend themselves to class-like treatment. The Blues cannot now seriously claim that all of the multiple, complex factors that they previously claimed "apply differently to different providers" somehow now demands the very "consolidated" treatment they previously opposed. In such circumstances the filing of a consolidated complaint is likely to take months, result in a Frankenstein-style consolidated complaint spanning hundreds of pages, impose

unnecessary costs on Provider Opt-Outs for no discernable benefit, and needlessly delay the progression—and, ultimately, the resolution—of the Provider Opt-Out cases.

*i. The "Short Form" Complaints the Blues Propose Would Waste Time and Resources*

The Blues' proposed short form complaint is clearly designed to be an unnecessary procedural roadblock to the orderly progress of this case and far beyond anything that could be considered reasonable or efficient. As an initial matter, the Blues do not identify any legal authority for imposing such additional pleading requirements without consent and fail to offer any compelling reason why such unnecessary procedural tactics would help advance the resolution of these important cases ***after*** the operative complaints have already been filed.

In addition, much of the requested information has already been provided to the Blues as part of the opt-out process and in the operative complaints. The opt-out process itself here was demanding, requiring detailed information to properly opt-out before the complaints were even filed. Moreover, the scope and level of detail required in the proposed short form complaint would be unprecedented in antitrust opt-out actions. Indeed, much of what the Blues are seeking at the pleading stage via their proposed short form complaint is detailed information that goes far beyond the notice pleading requirements of Rule 8. Certainly, if the Provider Opt-Out Complaints are "virtual copycats" of the Provider Class Complaint, then the Blues are on notice of the relevant claims. Some of the requested information, moreover, is essentially seeking the equivalent of premature contention interrogatories, which would not even be appropriate until the end of discovery. For example, the Blues seek to compel the Provider Opt-Outs to provide detailed information regarding standing, market definition, and causation at the pleading stage, but this information is already included in the relevant complaints and the Court has previously held that

such issues are "rarely" appropriate for resolution at the pleading stage. *See In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, No. 2:13-CV-20000-RDP, 2017 WL 2797267 (N.D. Al. June 28, 2017). Other information requested by the Blues was the subject of expert discovery and analysis in the Provider Class Actions and would likewise be the proper subject of Rule 702 testimony here.

To be sure, there are less than a handful of early-stage antitrust "direct actions" (essentially pre-opt-outs) where short form complaints were utilized. Only when the parties agreed to a consolidated master complaint, the "direct action" plaintiffs were proceeding alongside the class, the short-form complaints were merely brief box-checking exercises for the selection of claims, and the parties had not already provided extensive party information as part of the opt-out process. *See In re: Johnson & Johnson Talcum Powder Litig.*, MDL No. 2738, (D.N.J.); *In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, MDL No. 3047 (N.D. Cal).

Finally, it is important to recognize what accepting the Blues' proposal would do to the orderly progress of these actions. If accepted, the Provider Opt-Outs would need months to compile the requisite information and then file hundreds of short form complaints. The Blues have suggested that they intend to file Rule 12(c) motions at that juncture, which would take additional months to brief. This is not a proposal that promotes efficiency. It is a proposal that seeks to impose excessive burdens, delays the orderly progress of the case needlessly, and strategically prioritize defense-friendly issues at the expense of the Federal Rules of Civil Procedure.

#### *ii. The Court Should Not Allow the Blues Defendants to Use Rule 12(c) Motions as a Gimmick*

The Blues' proposal to file Rule 12(c) motions following the submission of an operative consolidated complaint and short form complaints is likewise unjustified. While the Blues are free

to file whatever motion they wish consistent with the Federal Rules, they have foreshadowed that they intend to forego Rule 12(b) motions and instead rely on Rule 12(c) as the primary basis to attack the pleadings. This speaks volumes about the Blues' own views about the strength of any motion to dismiss – if they thought they had a Rule 12(b) argument, they surely would make such a motion. A Rule 12(c) motion for judgment on the pleadings is limited to consideration of "the substance of the pleadings and any judicially noticed facts." *Porter Capital Corp. v. Johns Manville, Inc.*, No. 2:12-cv-00925, 2013 WL 3153519 (N.D. Ala. 2013) (Proctor, J). But the Blues have not identified any matters outside of the pleading that would warrant Rule 12(c) briefing here and, as such, it is difficult to see how their proposal does anything to advance the case.

Rule 12(c) is not a procedural gimmick that allows the Blues to essentially file an early motion for summary judgment and then preserve the opportunity to do so again later. If the court considers any matters outside the pleadings, the motion "*must* be treated as one for summary judgment under Rule 56" and all parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d) (emphasis added). As a practical matter, this means that there must be an opportunity to seek discovery on anything that would be presented in a Rule 12(c) motion. This is why it is common practice in antitrust opt-out actions to proceed into discovery directly, barring any "new" or unique Rule 12 issues, so that the parties can reach the summary judgment stage expeditiously. Otherwise, the Parties end up essentially submitting two summary judgment motions, which is highly inefficient and most courts prohibit.

Simply put, if the Blues believe that there is any "new" or unique issue with the operative complaints, they should identify it and file a motion to dismiss. If not, there is no reason to depart from common practice. The Parties should proceed to coordinated discovery —as envisioned by

the MDL panel—and expeditiously move the case forward toward summary judgment and, ultimately, trial.

### C. Standard of Review Briefing is Premature and Outside the Scope of Coordination

The Blues have inappropriately insisted on discussing a premature schedule to brief notional standard of review issues applicable to the newly filed Provider Opt-Out cases alongside the forthcoming briefing in the four-year-old ASO Opt-Out cases. This topic is plainly outside the bounds of the joint report requested by the Court and Special Master Gentle. Indeed, neither the Court nor Special Master Gentle has ever suggested that now is an appropriate time for Provider Opt-Outs to brief the issue. Nor should they. There is no need for further briefing of standard of review issues applicable to providers – the Court has decided the issue, and the Blues have not cited a single new fact or law since the 2022 decision to warrant revisiting it for Provider Opt-Outs. The Blues' attempt to shoehorn this issue into what is essentially the motion to dismiss stage so severely deprives the Provider Opt-Outs of their fundamental due process rights to manage and litigate their own cases that it is difficult to take seriously. If the Court ever decided to revisit standard of review issues for Provider Opt-Outs, that question would be one only addressable on a motion for summary judgment, and it could only be addressed after Provider Opt-Outs have developed their own discovery records. It cannot be addressed based on existing Provider Class records or ASO Opt-Out records.

*First*, the Blues have not articulated to Provider Opt-Outs in any meet-and-confer or in draft joint reports a single new law or fact that supports revisiting the applicable standard of review, nor why it should be addressed, if at all, in the context of preliminary coordination.[23] To the

[23] Provider Opt-Outs disagree that the Court must determine a standard of review before discovery. As this Court knows, that was not required in the Alabama bellwethers nor the ASO Opt-Out cases, nor is it happening in

contrary, they admit in this report– as they must – that they have no new basis for briefing standard of review for Provider Opt-Outs. Instead, they say without specificity that it must be re-briefed for the "very same" reasons that the Blues identified in the ASO Opt-Out cases and the Provider-track MDL. That rationale makes no sense.

- When the Court previously allowed the Blues to revisit the standard of review (as to the Provider Class in 2022 and the ASOs in 2018), each new bite at the apple was tethered to some change in facts, not just the Blues' desire to reconsider the issue.
- On the ASO Opt-Out side, re-briefing made sense. The Court last addressed the appropriate standard of review for Blue subscribers in 2018. That ruling did not address whether the "ASO market may be different than the rest of the Subscriber markets in 2018 in the MDL," nor did it address that, "under the Subscriber Settlement, ASOs have become entitled to a second [B]lue bid." Order at 2, 2:22-cv-01256-RDP (Dkt. No. 402) (Dec. 3, 2024). Open, undecided issues thus existed.
- The same is not true for Provider Opt-Outs. The Blues have not identified new law or fact since the 2022 decision that would require a different holding. They certainly cannot rely on the Provider Class Settlement, as it explicitly does not provide any relief to – and thus does not alter the status quo ante of – Provider Opt-Outs.

*Second*, even if the Court were inclined to re-open this settled issue again,[24] this is not the time to do so. It is well established in antitrust actions that the decision on the appropriate standard

---

concurrent litigation in Michigan federal court or California state court. Indeed, as explained *infra*, this issue is one for summary judgment, not a motion to dismiss, and the Court need not even consider the issue now.

[24] Of course, absent the Blues identification of a new fact, law, or argument, revisiting this issue risks creating an inconsistency in the standard of review applicable to the Provider Class and Provider Opt-Outs. The Blues' purported "two-sided market" argument is not enough to pass muster. Not only is this not a two-sided market as in *Amex*, and not only is the "two-sided market" issue not new, but the Blues previously admitted that two-sided market analysis is not relevant to standard of review. Response at 6-7, 2:13-cv-20000-RDP, (Dkt. No. 2752) (Jun.

of review "is more appropriate on a motion for summary judgment." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012). While the appropriate standard of review is a question of law, this Court itself has previously recognized that "numerous factual questions" are relevant to that analysis. As a result, this Court has previously concluded that it "cannot address the standard of review . . . until discovery takes place. And that's the Eleventh Circuit rule." April 21, 2017 Hr'g Tr., Dkt. No. 1109, 17:22-25; *see also* Motion to Dismiss Opinion, Dkt. No. 204 (denying 12(b)(6) motion on per se basis because it is "simply too early to assess…standard of review"). Summary judgment is in no way appropriate in the Provider Opt-Out cases at the pleading stage and prior to any opportunity to conduct their own discovery.

*Third*, it would violate Provider Opt-Outs' due process rights to compel them to brief standard of review in just four months based on the MDL and ASO Opt-Out records that, to date, Provider Opt-Outs have never seen. The Subscriber Class, Provider Class, and ASOs each briefed (or will brief) this issue after the close of discovery and on summary judgment.[25] As such, they all had the ability to develop a record in order to support their arguments for the applicable standard of review. Provider Opt-Outs have taken no discovery and developed no record. Although opportunities for coordination and efficiency exist, the Provider Opt-Out cases are ultimately different from prior litigations and retain their separate identities.[26] Each Provider Opt-Out will have its own theories of harm and damages. The Blues have previously argued that not just

---

21, 2021) ("*Amex* is not a standard-of-review decision . . . *Amex* [ ] spoke to *how* courts should conduct a rule-of-reason analysis, not *whether* the rule of reason applies in the first place.") (emphasis in original).

[25] Importantly, the ASOs' discovery was not limited by the MDL discovery record, nor by the Blues' desire to re-litigate standard of review issues.

[26] That said, the Provider Opt-Outs reserve their rights to dispute the depiction of overlaps and non-overlaps presented in the Venn diagrams included by Defendants and ASO Opt-Outs in their respective sections of this Joint Report.

discovery, but expert discovery, related to the Provider Class's damages model and theory of harm determines the appropriate standard of review. Defendants' Opening Brief on the Antitrust Standard of Review at 26-27, 2:13-cv-20000-RDP, (Dkt. No. 2728) (May 21, 2021). Provider Opt-Outs must have the opportunity to develop their own record on these points and litigate their own claims. *Home Depot USA, Inc. v. LaFarge N. Am.*, 59 F.4th 55 (3d Cir. 2023).

At base, the Blues want the Court to extend its prior rulings on the standard of review for Price-Fixing and Group Boycott Claims, but not for the Horizontal Market Allocation Claims.[27] Yet they cannot have their cake and eat it, too. The Blues could argue (as they do) that facts and laws relevant to standard of review have not changed, in which case they can credibly take the position that Provider Opt-Outs need no new discovery relevant to the standard of review as the entire 2022 decision should be extended. On the other hand, they can argue that facts or law have changed sufficiently to warrant revisiting standard of review, in which case the 2022 decision should not apply, and the parties must engage in discovery to address those hypothetical new facts and legal arguments (of which the Blues have articulated none). What the Blues cannot do is cherry pick prior rulings and deny Provider Opt-Outs their due process rights to litigate standard of review based on their own fully developed discovery records on a motion for summary judgment.

[27] Contrary to the Blues' representation, Provider Opt-Outs do not concede that the rule of reason would apply to Price-Fixing and Group Boycott Claims, nor to the Horizontal Market Allocation Claims post-dating 2021. In fact, upon completion of discovery, Provider Opt-Outs fully expect to find evidence that the Blues continued to engage in anticompetitive conduct after the Subscriber Settlement that would warrant *per se* review to the present.

Dated: September 10, 2025

Respectfully submitted,

By /s/ Karin A. DeMasi

Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
Rachel Skaistis
Lillian S. Grossbard
Rebecca J. Schindel
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 474-1000
Fax: (212) 474-3700
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com
rskaistis@cravath.com
lgrossbard@cravath.com
rschindel@cravath.com

*Lead Counsel for the Blue Cross Blue Shield System; Counsel for Defendants Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; GuideWell Mutual Holding Corporation; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina; BlueCross BlueShield of South Carolina; BlueCross BlueShield of Tennessee, Inc.; Blue Cross Blue Shield of Wyoming; California Physicians' Service d/b/a Blue Shield of California; Capital Blue Cross; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Health Care Service Corporation, an Illinois Mutual Legal Reserve Company,*

*including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Triple-S Management Corporation; Triple-S Salud, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Elizabeth Jose
W. David Maxwell
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
elizabeth.jose@hoganlovells.com
david.maxwell@hoganlovells.com

*Counsel for Elevance Health f/k/a Anthem, Inc., and all of its named subsidiaries in this action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield; Regence*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Arizona, Inc.; Blue Cross and Blue Shield of Kansas City; BlueCross BlueShield of South Carolina; Blue Cross and Blue Shield of Wyoming; Capital Blue Cross; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue*

*Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Elevance Health f/k/a Anthem, Inc., and all of its named subsidiaries in this action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); BlueCross BlueShield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield; Regence Blue Cross Blue Shield of Oregon; Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc; Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Cavender C. Kimble

*Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Health; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark BCBSD Inc.; California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii)*

Carl S. Burkhalter
MAYNARD NEXSEN PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
cburkhalter@maynardnexsen.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza

BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Elevance Health f/k/a Anthem, Inc., and all of its named subsidiaries in this action; Blue Cross and Blue Shield of North Carolina; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield; Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendant Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX 75234
Tel: (214) 987-1745
Fax: (214) 521-9033

Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
jzeiger@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Health; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark BCBSD Inc.; Highmark Western and Northeastern New York Inc. (except with respect to claims by Rite Aid Corporation and its affiliates and Bed, Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, Inc. and its affiliates, and discovery to RTX Corporation and its affiliates and General Motors Company and its affiliates)*

Jonathan M. Redgrave
REDGRAVE, LLP
4800 Westfields Blvd, Suite 250
Chantilly, VA 20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants and California Physicians' Service d/b/a Blue Shield of*

bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

M. Patrick McDowell
Norman E. "Benje" Bailey, Jr.
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
pmcdowell@brunini.com
bbailey@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF MISSISSIPPI, A MUTUAL INSURANCE COMPANY
P.O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company*

Alan D. Rutenberg
FOLEY & LARDNER LLP

*California*

Todd M. Stenerson
Brian C. Hauser
ALLEN OVERY SHEARMAN STERLING US LLP
1101 New York Avenue N.W.
Washington, DC 20005
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@aoshearman.com
brian.hauser@aoshearman.com

Rachel Mossman Zieminski
ALLEN OVERY SHEARMAN STERLING US LLP
2601 Olive Street, Suite 1700
Dallas, TX 75201
Tel: (214) 271-5777
Fax: (214) 271-5778
rachel.zieminski@aoshearman.com

Sarah L. Cylkowski
Alexandra Markel
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI 48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
amarkel@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750

3000 K Street, N.W., Suite 600
Washington, DC 20007
Tel: (202) 672-5491
Fax: (202) 672-5399
arutenberg@foley.com

Diane R. Hazel
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200
Denver, CO 80202
Tel: (720) 437-2034
Fax: (720) 437-2200
dhazel@foley.com

Thomas J. Diaz
USABLE MUTUAL INSURANCE COMPANY
601 S. Gaines Street, 8th Floor
Little Rock, Arkansas 72201
Tel: (501) 378-2380
tjdiaz@arkbluecross.com

*Counsel for Defendant USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield and as BlueAdvantage Administrators of Arkansas*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP

Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendants Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of Vermont*

John DeQ. Briggs
Jeny M. Maier
Kenina J. Lee
AXINN, VELTROP & HARKRIDER, LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
jmaier@axinn.com
klee@axinn.com

Kail J. Jethmalani
Victoria J. Lu
AXINN, VELTROP & HARKRIDER, LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
Tel: (212) 728-2200
Fax: (212) 728-2201
kjethmalani@axinn.com
vlu@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5080
Fax: (205) 250-5034

One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Morris Wade Richardson
(ASB-8581-S78M)
Charles T. Grimes
(ASB-3224-S77C)
RICHARDSON CLEMENT PC
22 Inverness Center Parkway, Suite 500
Birmingham, Alabama 35242
Tel: (205) 729-7000
Facsimile: (205) 905-7009
wade@richardson.law
charley@richardson.law

*Counsel for Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, and Lifetime Healthcare Inc., as relevant*

steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendants Independence Hospital Indemnity Plan, Inc. f/k/a Independence Blue Cross; Independence Health Group, Inc.*

Jay P. DeSanto
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
jdesanto@crowell.com

Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Ave.
New York, NY 10001
Tel: (212) 223-4000
Fax: (212) 223-4134
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross and*

*Blue Shield of Nebraska; GoodLife Partners, Inc.; Blue Cross of Idaho Health Service, Inc.; Blue Cross and Blue Shield of Kansas, Inc.; Blue Cross Blue Shield of North Dakota*

Dated: September 10, 2025

Respectfully submitted,

By: */s/ Jay M. Ezelle*
Jay M. Ezelle
H. Thomas Wells, III
Benjamin T. Presley
Starnes Davis Florie LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
Tel: (205) 868-6000
jezelle@starneslaw.com
twells@starneslaw.com
bpresley@starneslaw.com

*Counsel for all Plaintiffs in the Alaska Air and JetBlue cases.*

By: */s/ Paul E. Slater*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING KENNY NACHWALTER, LLC
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
pes@sperlingkenny.com
jvanek@sperlingkenny.com
dgermaine@sperlingkenny.com
ekelly@sperlingkenny.com

By: */s/ Phillip F. Cramer*
Phillip F. Cramer
SPERLING KENNY NACHWALTER, LLC
1221 Broadway, Suite 2140
Nashville, TN 37203
Tel: (312) 641-3200
Fax: (312) 641-6492
pcramer@sperlingkenny.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, The Kraft Heinz Company, Kraft Heinz Group Benefits*

*Plan, Kraft Heinz Retiree Group Benefits Plan, and North Central States Regional Council of Carpenters' Health Fund*

*Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; Kellogg Company Retiree Welfare Benefit Plan; The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; North Central States Regional Council of Carpenters' Health Fund; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc.*

*("UNFI"); UNFI Health and Welfare Plan; Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters' Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund; Heartland Health & Wellness Fund; GuideStone Financial Resources; GuideStone group Plan; GuideStone Personal Plan; Church Pension Group Services Corporation; General Board of Pension and Health Benefits of the United Methodist Church; Concordia Plan Services; Concordia Health Plan; Portico Benefits Services (the Evangelical Lutheran Church in America's benefit board); Christian Brothers Services (a church plan benefits board created by the Christian Brothers religious order); Christian Brothers Employee Benefit Trust; The Board of Pensions of the Presbyterian Church U.S.A.; The Benefits Plan of the Presbyterian Church (U.S.A.); Employee Benefits Plan of MBM Corporation; and the MBM Corporation*

By: */s/ J. Scott Hickman*
J. Scott Hickman
Eric G. Osborne
SHERRARD ROE VOIGT &
HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
Fax: (615) 742-4539
shickman@srvhlaw.com
eosborne@srvhlaw.com

*Counsel for The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan, and*

*North Central States Regional Council of Carpenters' Health Fund*

*Counsel for The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; CHS/Community Health Systems Inc., sponsor and administrator of the Community Health Systems Group Health Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; Tractor Supply Company; Tractor Supply Medical Plan*

By: */s/ Jason A. Zweig*

Jason A. Zweig
BARTKO LLP
1 South Wacker Drive
36th Floor
Chicago, IL 60606
Tel: (415) 956-1900
Fax: (415) 956-1152
jzweig@bartkolaw.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, McLane Foodservice*

*Distribution, Inc., and Employee Benefits Plan of MBM Corporation*

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc.; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; American Electric Power Service Corporation; American Electric Power System Comprehensive Medical Plan; Big Lots, Inc.; Big Lots Associate Benefit Plan; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Corporation Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; FedEx Corporation; The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan; Employee Benefits Plan of MBM Corporation; and the MBM Corporation*

*/s/ William J. Blechman*
William J. Blechman
Joshua B. Gray
Elizabeth B. Honkonen
SPERLING KENNY NACHWALTER, LLC

Four Seasons Tower - Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
wjb@sperlingkenny.com
jgray@sperlingkenny.com
ebh@sperlingkenny.com

*Counsel for US Foods, Inc.*

*Counsel for Albertsons Companies Inc.; New Albertsons L.P.; Albertson's LLC; New Albertson's Inc.; Safeway Inc.; Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan; New Albertson's Inc. Health and Welfare Plan; Hy-Vee Inc.; Hy-Vee and Affiliates Benefit Plan and Trust; The Kroger Co.; 84.51 LLC; Murray's Cheese LLC; The Kroger Co. Health and Welfare Benefit Plan; 84.51 LLC Health & Welfare Plan; Walgreen Co.; US Foods Holding Corporation; US Foods, Inc.; US Foods Health & Welfare Plan; Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan*

*/s/ Jon Corey*

Jon Corey
MCKOOL SMITH, PC
1999 K Street, NW
Suite 600
Washington, D.C. 20006
(213) 694-1200
jcorey@mckoolsmith.com

John Briody
James Smith
David Schiefelbein
Daniel Hendler
MCKOOL SMITH, PC
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001

(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com
dschiefelbein@mckoolsmith.com
dhendler@mckoolsmith.com

Lew LeClair
Gary Cruciani
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000
lleclair@mckoolsmith.com
gcruciani@mckoolsmith.com

Brenton K. Morris
BENTON, CENTENO & MORRIS, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
(205) 278-8000
bmorris@bcattys.com

*Counsel for Bed, Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, Inc.; Automobile Club of Southern California; Darling Ingredients Inc.; Griffin Industries, LLC; Dillard's, Inc.; Halliburton Energy Services, Inc.; G4S Secure Solutions (USA), Inc.; Kimberly-Clark Corporation; Lincoln National Corporation; Live Nation Entertainment, Inc.; Nestlé USA, Inc.; Perdue Farms Inc.; Pacific Gas and Electric Company; PG&E Corporation; RTX Corporation; Raytheon Company; Rockwell Collins, Inc.; Rite Aid Corporation; Rite Aid Hdqtrs. Corp.; Sterling Jewelers Inc.; Zale Corporation; Zale Delaware, Inc.; Starbucks Corporation; Tyson Foods, Inc.; SRZ Liquidating Trust; Transform Midco LLC; and General Motors LLC*

Date: September 10, 2025

*/s/ Kathryn A. Reilly*
Kathryn A. Reilly
Michael T. Williams
Judith P. Youngman
Galen D. Bellamy
Joel S. Neckers
Michael R. Krantz
370 17th Street, Suite 4500
Denver, CO 80202
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Suite 4500
Denver, CO 80202
Email: reilly@wtotrial.com
Telephone: (303) 244-1918

*Attorneys for Plaintiffs Corewell Health, Iowa Health System d/b/a UnityPoint, and Hospital Sisters Health System*

*/s/ Judith A. Zahid*
Judith A. Zahid
Eric W. Buetzow
Heather T. Rankie
Sarah Van Culin
**Zelle LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
jzahid@zellelaw.com
ebuetzow@zellelaw.com
hrankie@zellelaw.com
svanculin@zellelaw.com

*Attorneys for Associated Health Services, Inc.; Duke Affiliations Network, Inc.; Duke Health Integrated Practice, Inc.; Duke University Affiliated Physicians, Inc.; Duke University Health System, Inc.; Duke University*

BRENNA BIRD
Attorney General of Iowa

Respectfully submitted,

*/s/ Ryan P. Phair*
Ryan P. Phair
Michael F. Murray
Carter C. Simpson
Christopher C. Brewer
Emma Hutchison
Terence Parker
Hasan Siddiqui
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
ryanphair@paulhastings.com
michaelmurray@paulhastings.com
cartersimpson@paulhastings.com
chrisbrewer@paulhastings.com
emmahutchison@paulhastings.com
terenceparker@paulhastings.com
hasansiddiqui@paulhastings.com
Telephone: (202) 551-1751

Renato Mariotti
Michael Morrill
**Paul Hastings LLP**
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
renatomariotti@paulhastings.com
michaelmorrill@paulhastings.com
Telephone: (312) 499-6000

Stephen J. McIntyre
**PAUL HASTINGS LLP**
515 South Flower Street, Fl. 25
Los Angeles, CA 90071
stephenmcintyre@paulhastings.com
Telephone: (213) 683-6110

Navi S. Dhillon
Kiaura Clark
**Paul Hastings LLP**
1999 Avenue of the Stars, Fl. 27
Los Angeles, CA 90067
navidhillon@paulhastings.com
kiauraclark@paulhastings.com
Telephone: (310) 620-5700

/s/ Eric H. Wessan
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State University of Iowa*

/s/ Robert M. Cooper
Robert M. Cooper
Hershel Wancjer
**KING & SPALDING LLP**
1700 Pennsylvania Avenue
NW Suite 900
Washington, DC 20006
rcooper@kslaw.com
hwancjer@kslaw.com
Telephone: (202) 737-0500

Damien Marshall
Ross E. Elfand
Marisa Manzi
Annika Burton
Alexandra Valas
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor New York, NY 10036
dmarshall@kslaw.com
relfand@kslaw.com
mmanzi@kslaw.com
aburton@kslaw.com
lvalas@kslaw.com
Telephone: (212) 556-2100

*Attorneys for Plaintiffs NorthBay Healthcare Corporation; ApolloMD Business Services, LLC; Beebe Medical Center, Inc. d/b/a Beebe Healthcare; Covenant Health, Inc.; Kaweah Delta Health Care District; Memorial Health Services d/b/a MemorialCare Health System; Mount Sinai Medical Center of Florida, Inc.; North Broward Hospital District d/b/a Broward Health; Ochsner*

Barry G. Sher
Avi Weitzman
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
barrysher@paulhastings.com
aviweitzman@paulhastings.com
Telephone: (212) 318-6000

*Attorneys for Adventist Health System Sunbelt Healthcare Corporation d/b/a AdventHealth; Adventist Health System/West; Ardent Health Partners, Inc.; Banner Health; Christiana Care Health Services, Inc.; City of Hope; CHS/Community Health Systems; Corewell Health; Duke Affiliations Network, Inc.; Duke Health Integrated Practice, Inc.; Duke University Affiliated Physicians, Inc.; Duke University Health System, Inc.; Duke University; Henry Ford Health System d/b/a Henry Ford Health; Hospital Sisters Health System; Inova Health Care Services; Iowa Health System d/b/a UnityPoint Health; Knight Health Holdings, LLC; Lifepoint Health, Inc.; Mass General Brigham Incorporated; Mercy Hospital, Iowa City, Iowa, and Mercy Service Iowa City, Inc.; Northeast Georgia Health System; Novant Health, Inc.; Rochester Regional Health; Sound Inpatient Physicians, Inc.; State University of Iowa; Sutter Health; Texas Health Resources; the University of Wisconsin Hospitals and Clinics Authority; Associated Health Services, Inc.*

/s/ Cindy Reichline
Keith Butler
Cindy Reichline
Shira Liu
Fiona Tang
Taylor Keating
Ryan Roth
**BRS LLP**
2121 Avenue of the Stars
Suite 800

*Clinic Foundation; Ochsner LSU Health System of North Louisiana; Hospital Service District No. 1 of St. Charles Parish; St. Tammany Parish Hospital Service District No. 2; Salinas Valley Memorial Healthcare System d/b/a Salinas Valley Health; Steward Health Care System LLC; Tallahassee Memorial HealthCare, Inc.; Lubbock County Hospital District; CEP America, LLC d/b/a Vituity*

/s/ *Sean S. Zabaneh*
Sean S. Zabaneh
Sean P. McConnell
Sarah O'Laughlin Kulik
Jessica Priselac
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1000
sszabaneh@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com
jpriselac@duanemorris.com

Rebecca Bazan
**DUANE MORRIS LLP**
901 New York Avenue N.W., Ste 700 East
Washington, D.C. 20001
(202) 766-7800
rebazan@duanemorris.com

Wilson F. Green
**Wilson F. Green LLC**
301 19th Street North, Ste. 525
Birmingham, AL 35203
(205) 722-1018
wilson@wilsongreenlaw.com

*Attorneys for Plaintiffs Temple University Health System, Inc.; The Trustees of the University of Pennsylvania; The Children's Hospital of Philadelphia; Northwell Health, Inc.; HMH Hospitals Corporation; The Nemours Foundation; Penn State*

Los Angeles, CA 90067
Tel: (310) 295-9524
kbutler@brsllp.com
creichline@brsllp.com
sliu@brsllp.com
ftang@brsllp.com
tkeating@brsllp.com
rroth@brsllp.com

*Attorneys for Plaintiffs Allina Health System; Atlantic Health System; CentraCare Health System; Fairview Health Services; Mayo Clinic; RWJ Barnabas Health, Inc.; University of Florida Health Corporation; and The University of Chicago Medical Center*

/s/ *Jon Corey*
Jon Corey
**MCKOOL SMITH, PC**
1717 K Street NW, Suite 1000
(202) 370-8300
jcorey@mckoolsmith.com

John Briody
James Smith
**MCKOOL SMITH, PC**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com

Lew LeClair
**MCKOOL SMITH, PC**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000
lleclair@mckoolsmith.com

*Attorneys for Plaintiffs Temple University Health System, Inc.; The Trustees of the University of Pennsylvania; The Children's Hospital of Philadelphia; Northwell Health, Inc.; HMH Hospitals Corporation; The Nemours Foundation; Penn State*

*Health; WellSpan Health; Geisinger Health; MedStar Health, Inc.; Tower Health; Doylestown Hospital; Grand View Hospital d/b/a Grand View Health; Halifax Hospital Medical Center; Hunterdon Healthcare System, Inc.; Meadville Medical Center; St. Clair Health Corporation; Penn Highlands Healthcare, Inc.; Holy Redeemer Health System; St. Luke's Health Network, Inc. d/b/a St. Luke's University Health Network; Independence Health System; Eastern Maine Healthcare Systems d/b/a Northern Light Health; LHHealth, LLC, Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center, Inc.; Radiology Partners, Inc.; and Highlands Oncology Group, P.A.*

/s/ *Steven Sklaver*
Steven Sklaver
Glenn C. Bridgman
Molly A. Karlin
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
mkarlin@susmangodfrey.com

Tanner Laiche
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
tlaiche@susmangodfrey.com

Cyril V. Smith
csmith@zuckerman.com
**ZUCKERMAN SPAEDER LLP**
100 E Pratt Street, Suite 2440
Baltimore, MD 21202
Telephone: (410) 332-0444
Facsimile: (410) 659-0436

*Health; WellSpan Health; Geisinger Health; MedStar Health, Inc.; Tower Health; Doylestown Hospital; Grand View Hospital d/b/a Grand View Health; Halifax Hospital Medical Center; Hunterdon Healthcare System, Inc.; Meadville Medical Center; St. Clair Health Corporation; Penn Highlands Healthcare, Inc.; Holy Redeemer Health System; St. Luke's Health Network, Inc. d/b/a St. Luke's University Health Network; Independence Health System; Eastern Maine Healthcare Systems d/b/a Northern Light Health; LHHealth, LLC, Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center, Inc.; Radiology Partners, Inc.; and Highlands Oncology Group, P.A.*

/s/ *Jennifer S. Collins*
Jennifer S. Collins
**WOMBLE BOND DICKINSON (US) LLP**
1331 Spring St. NW, Suite 1400
Atlanta, Georgia 30309
Jennifer.Collins@wbd-us.com
Telephone: (404) 879-2472

Jason C. Hicks
Ian R. Dickinson
**WOMBLE BOND DICKINSON (US) LLP**
201 E. Main Street, Suite P
Charlottesville, VA 22902
Jason.Hicks@wbd-us.com
Ian.Dickinson@wbd-us.com
Telephone: (202) 857-4536

Christos Christodoulou
**WOMBLE BOND DICKINSON (US) LLP**
2001 K Street NW
Washington, DC 20006
Christos.Christodoulou@wbd-us.com
Telephone: (202) 857-4563

Richard J.R. Raleigh, Jr.
**WOMBLE BOND DICKINSON (US) LLP**
200 Davis Cir SW
Suite 200
Huntsville, Alabama 35801

Christopher R. MacColl
cmaccall@zuckerman.com
**ZUCKERMAN SPAEDER LLP**
2100 L Street NW, Suite 400
Washington, D.C. 20037
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Plaintiffs Memorial Hospital for Cancer and Allied Diseases, Memorial Sloan-Kettering Cancer Center, and South Shore Hospital, Inc.*

*/s/ Daniel L. Warshaw*
DANIEL L. WARSHAW
dwarshaw@pwfirm.com
BOBBY POUYA
bpouya@pwfirm.com
MICHAEL H. PEARSON
mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*Attorneys for Plaintiffs IES Central Texas PLLC; IES HSP Indiana LLC; IAS Arizona PLLC; IAS Oklahoma LLC; IES Alabama PLLC; IES Arizona PLLC; IES Colorado PLLC; IES Carrollton PLLC; IES Florida PLLC; Integrative Emergency Services Physician Group -Houston, PLLC; IES HSP Oklahoma LLC; IES Hospitalists PLLC; IES Oklahoma LLC; IES South Carolina LLC; Integrative Health Arizona LLC; Integrative Care Services Florida LLC; IES OBS Colorado PLLC; Integrative Emergency Services Physician Group, P.A.; IES Arkansas PLLC; IES Hsp Arkansas PLLC; IES Missouri LLC; IES Hsp Missouri LLC; Integrative Health Texas PLLC, AmeriTeam Services, LLC; Southeastern Emergency Physicians LLC; Texas Medicine Resources, LLP;*

Richard.Raleigh@wbd-us.com
Telephone: (256) 834-8651

Attorneys for Plaintiffs Phoebe Putney Memorial Hospital, Inc., Phoebe Sumter Medical Center, Inc., Phoebe Worth Medical Center, Inc., and Phoebe Physician Group, Inc.

*/s/ Michael E. Martínez*
Michael E. Martínez (Ill. Bar No. 6275452)
Lauren Norris Donahue (Ill. Bar No. 6294505)
Victoria S. Pereira Duarte (Ill. Bar No. 6336540)
**K&L GATES LLP**
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372-1121
Michael.Martinez@klgates.com
Lauren.Donahue@klgates.com
Victoria.Duarte@klgates.com

Michael J. Stortz (Cal. Bar No. 139386)
**K&L GATES LLP**
4 Embarcadero Ctr, Suite 1200
San Francisco, California 94111
Telephone: (415) 882-8200
Michael.Stortz@klgates.com

Richard W. Fields (D.C. Bar No. 418444)
Martin Cunniff (D.C. Bar No. 424219
Edward Han (D.C. Bar No. 394515)
**FIELDS HAN & CUNNIFF PLLC**
1701 Pennsylvania Avenue NW, Suite 200
Washington, D.C.
Telephone: (833) 382-9816
fields@fhcfirm.com
martincunniff@fhc.com
edhan@fhcfirm.com

*Counsel for Bon Secours Mercy Health, Inc., University Health Systems of Eastern Carolina, Inc., Endeavor Health, INTEGRIS Health, Inc., Main Line Health, Inc., Medical University Hospital Authority, Mercy Health,*

*Emergency Coverage, LLC; Florida Emergency Physicians Kang & Associates, M.D., LLC; Longhorn Emergency Medicine Associates, P.A.; Mid-Ohio Emergency Services LLC; ACS Primary Care Physicians – Southeast, P.C.; Fremont Emergency Services (Scherr), Ltd.; Texas Physician Resources, LLP; InPhyNet South Broward, LLC; Paragon Contracting Services, LLC; Paragon Emergency Services LLC; ACS Primary Care Physicians Southwest, P.A.; Southeastern Emergency Physicians of Memphis, LLC; Emergency Services of Oklahoma, P.C., CommonSpirit Health; Dignity Health; Dignity Community Care; Virginia Mason Franciscan Health; Catholic Health Initiatives Colorado; St. Luke's Health System Corporation d/b/a CHI St. Luke's Health; CHI Nebraska d/b/a CHI Health; and KentuckyOne Health, Inc.*

*/s/ Harvey J. Wolkoff*
Harvey J. Wolkoff
Aliki Sofis
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
111 Huntington Avenue, Suite 520
Boston, MA 02199-3600
Tel.: (617) 712-7100
harveywolkoff@quinnemanuel.com
alikisofis@quinnemanuel.com

Adam B. Wolfson
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
Tel.: (213) 443-3000
adamwolfson@quinnemanuel.com

David LeRay
Samuel I. Waranch
Vinay S. Basti
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*Norton Healthcare, Inc., Providence St. Joseph Health, Roper St. Francis Healthcare, Sanford, Thomas Jefferson University, The Regents of the University of Michigan on behalf of University of Michigan Health, University of North Carolina Health Care System, University of Rochester, and West Virginia United Health System, Inc.*

*/s/ William Lavery*
William Lavery
Joseph Ostoyich
Danielle Morello
Jordan Passmore
Dorothea R. Allocca
Sung Shin
**CLIFFORD CHANCE US LLP**
2001 K Street NW
Washington, DC 20006
Tel: (202) 912-5000
william.lavery@cliffordchance.com
joseph.ostoyich@cliffordchance.com
danielle.morello@cliffordchance.com
jordan.passmore@cliffordchance.com
dodi.allocca@cliffordchance.com
sung.shin@cliffordchance.com

Sanaz Payandeh
**CLIFFORD CHANCE US LLP**
Two Manhattan West
375 9th Avenue
New York, New York 10001
Tel: (212) 878-8000
sanaz.payandeh@cliffordchance.com

*Attorneys for Plaintiffs Mount Nittany Health System and Weill Cornell Medicine*

295 Fifth Ave., 9th Fl.
New York, NY 10016
Tel.: (212) 849 7100
davidleray@quinnemanuel.com
samuelwaranch@quinnemanuel.com
vinaybasti@quinnemanuel.com
*Attorneys for Plaintiffs Boston Children's Hospital et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 10th day of September, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all Counsel of record.

*/s/ Nikol A. Oydanich*
Nikol A. Oydanich